# IN THE COURT OF APPEALS OF IOWA

No. 21-0940
Filed December 7, 2022

**GREGORY SCOTT INGRAM,**
 Plaintiff-Appellee,

**vs.**

**IOWA INTERSTATE RAILROAD, LTD.,**
 Defendant-Appellant.

_____

 Appeal from the Iowa District Court for Linn County, Jason D. Besler, Judge.


 An employer appeals the denial of its motions for a new trial and judgment notwithstanding the verdict. **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**


 Meredith A. Moore of Cutler Law Firm, LLP, Sioux Falls, South Dakota, and Onna B. Houck, Cedar Rapids, for appellant.

 Matthew L. Preston, Brad Brady, and Cara L. Roberts of Brady Preston and Gronlund PC, Cedar Rapids, for appellee.


 Heard by Vaitheswaran, P.J., and Greer and Badding, JJ.

**GREER, Judge.**

Despite his termination from Iowa Interstate Railroad, Ltd. (the Railroad) in November 2018, Gregory Ingram argues he was still entitled to a retention bonus set to pay out at the end of the year. When the payment did not arrive, he sued the Railroad for breach of contract and pursued his rights under the Iowa Wage Payment Collection Law (IWPCL). To block these claims, the Railroad moved for summary judgment, but it lost that round. Then at trial, the Railroad moved for directed verdict at the end of Ingram's case and at the end of trial. Those motions centered on an argument that Ingram only estimated the amount of bonus due and did not reliably establish an amount for his damage claim.[1] The district court denied the motions. After a trial on the merits and the submission of the case, the jury found in Ingram's favor and awarded all of the damages Ingram requested. After the verdict, the Railroad moved for a new trial and for judgment notwithstanding the verdict (JNOV); both were denied. It now appeals, renewing its concerns the district court should have granted summary judgment and its motions for a new trial and JNOV. Finally, after the jury awarded damages, Ingram requested his attorney fees and expenses for trial be paid under the authority of IWPCL. The district court granted Ingram's request, and the Railroad also appeals from that attorney-fee and expense ruling.

As a matter of law, we cannot review the district court's denial of issues contested at the summary judgment stage that were not raised at trial. And we

---

[1] At the end of the trial on the merits of Ingram's claims, the Railroad added to its motion-for-directed-verdict argument a request for dismissal based on a theory of the objective reasonableness standard.

find no error or abuse of discretion in what has been properly preserved for our review involving the denial of the Railroad's motion for JNOV and new trial. However, we find the district court abused its discretion in awarding attorney fees as to the award of copying costs. As such, we reverse the award to remove the copying costs but otherwise affirm. Because Ingram was largely successful in defending his claims on appeal, we remand to the district court to determine an appropriate award of appellate attorney fees.

**I. Facts and Procedural History.**

Ingram was hired by the Railroad as an Assistant Chief Engineer-Track Maintenance in April 2012. The Railroad's president and chief executive officer identified Ingram to be a part of their "key manager retention plan." The plan's purpose was to "retain those selected management individuals who, in the view of the President and CEO with concurrence of the Board of Directors, play key roles in the ongoing success and progress of [the Railroad] and have demonstrated success in carrying out their job duties in this regard." The plan listed the active participants, including Ingram, and explained they would "cease being [a]ctive [p]articipants" if certain conditions were met; the condition relevant to this case was "[r]esignation from [the Railroad] or termination for cause, upon which all amounts otherwise due from [r]etention [a]wards previously made shall be forfeited." The term "for cause" was not defined.

Each active participant had a retention account, over which the Railroad maintained records. In exchange for remaining an active plan participant and "continuously remain[ing] a full-time employee of [the Railroad]," the active

participant was eligible to receive a retention award each year.[2] Each year's award amount was equal to "(1) 30% of the [a]ctive [p]lan [p]articipant's annual salary earned in each [p]lan year times (2) [e]ach [p]lan [y]ear's [r]etention [a]ward [f]actor." The retention award factor was determined based on the company's audited yearly earnings, which would be determined the following spring; then, the award was credited to the retention account. The retention account would become payable in shifts, specifically:

> The first 50% of the accrued payment will be paid following the audit of the fifth year's December 31 financial statements and the Board's certification that the [p]articipant has become entitled to payment. The employee must be an active employee of [the Railroad] as of December 31 of the fifth [p]lan year.
> The remaining 50% will be paid to the [p]articipant in January following the sixth calendar year, if the employee remains an active or retired employee of [the Railroad].

Ingram's five years began on January 1, 2013, meaning he would be eligible for the first half of the accrued payment after December 31, 2018, and the second half as of January 2019. Each year, the Railroad provided a statement to the plan's members. Ingram's 2017 statement showed an accrual of $31,500, putting his year-end total at $127,663.

The Railroad terminated Ingram's employment on November 16, 2018. Along with his termination letter, Ingram received a separation agreement, in which the Railroad offered to pay what portion of the plan payment would have been due had he remained employed through December 31, 2018—a payment the Railroad

---

[2] The plan's terms defined the year as a calendar year, which began "the first January 1 following approval of the individual as an [a]ctive [p]lan [p]articipant."

said was otherwise not due to Ingram. Ingram ultimately did not accept the separation proposal. He never received a 2018 retention-account statement.

Ingram sued the Railroad, arguing both that the Railroad (1) breached its contract by failing to pay him the bonus and (2) failed to pay earned wages, violating the IWPCL. He calculated that, at the end of year five, his retention account totaled $165,385.

Ahead of trial, Ingram provided a list of witnesses he wished to depose, including the Railroad's in-house counsel, Onna Houck; Chief Administrative Officer, Bobbi Allen; and Chief Operating Officer, Alan Satunas. The Railroad moved for a protective order to prevent the deposition of Houck, arguing she had no direct involvement in Ingram's termination. The district court held that Ingram would have to complete all other scheduled depositions first then he could apply to the court to depose Houck. But the district court also held Houck could not testify in any capacity unless she was made available for Ingram to depose. Ingram took depositions of both Allen and Satunas, who the Railroad also offered as corporate representatives.

Eventually, the Railroad moved for summary judgment on both claims, which the district court denied. The Railroad did not ask for interlocutory appeal from this ruling, so the case proceeded to trial.

To prove his claims at trial, Ingram presented evidence of his understanding of the plan and his experience with the Railroad. He testified that Jerome Lipka approached him about joining the retention plan—Lipka was, at the time, the Railroad's president and also the plan's drafter. Ingram explained that Lipka conveyed to him that, to get the retention plan benefits, an employee had to

> Keep your nose clean. No drugs and alcohol. Don't get accused of theft and don't be insubordinate. As long as you don't have the heavy hitters and, obviously, there's, you know, you've got to do your daily job and keep performing at the level that [Lipka had] been impressed with, you will have no problem.

But even with this advice, Ingram found other barriers to success at the Railroad because of his interactions with his supervisor, Chad Lambi. At trial, Ingram testified about his contentious relationship with Lambi around the time of his termination. As an example of the two butting heads, Ingram discussed a washout—or when "water rushes up against the track from a flood or heavy rain and it takes the rock out of the track and it can move the track around"—that occurred in July 2018. Ingram was at the site with the roadmaster,[3] Collins Smith, working on the issue. In particular, there was a bridge that seemed to be "kinked or twisted." Ingram testified that he was concerned a crew and train was being sent out that would cross the compromised bridge, so he called Lambi. Ingram asserted Lambi told him to "[s]end the fucking train." When Ingram protested, Lambi said that if he arrived on the scene and disagreed with Ingram's assessment, Ingram would be terminated. Eventually, Lambi arrived at the scene and the bridge sagged down into the water, which showed Ingram's concerns were valid. In an additional example of animus, Ingram described a company social event where Houck cursed and yelled at him in front of other management. He also testified he was never told why he was terminated.

After Ingram finished presenting his case and rested, the Railroad moved for directed verdict. In so moving, the Railroad argued Ingram failed to establish

---

[3] At trial, a roadmaster was described as "the manager of a territory for the track," who was "given a section of track . . . to maintain."

what the damages would be because his retention award had not been calculated for year five and because Ingram's termination would have changed the company's "bottom line" and, thus, the retention factor it ended up using. So, the Railroad argued, without an expert witness to contextualize and adjust the numbers accordingly, there was no showing of what the exact damages should be for either the breach-of-contract or IWPCL claims. Ingram argued he supplied sufficient evidence to support his $164,385 figure and for a jury to determine if that was the appropriate amount. The district court, evaluating the evidence in the light most favorable to Ingram, determined Ingram produced sufficient evidence for the jury to reasonably ascertain damages; so, it denied the motion.

To show it had cause for Ingram's termination, the Railroad provided evidence about three different incidents it believed were terminable offenses—an interaction with a disgruntled employee in September 2018, an employee-injury investigation in October 2018, and a derailment investigation in October 2018. The Railroad also discussed its interpretation of the plan and its requirements. As part of its case-in-chief, it attempted to offer the separation agreement into evidence. Ingram objected, arguing the agreement was inadmissible under Iowa Rule of Evidence 5.408(a), which disallows the admission of settlement offers "to prove the validity or amount of a disputed claim." The Railroad argued this evidence was being offered not to challenge liability but to show the Railroad did not think the wages were due and did not act with animus in withholding them from Ingram. And, because Ingram had referenced the separation agreement, the Railroad believed the door had been opened. The district court sustained the objection and excluded the agreement, but it did allow the Railroad to discuss the separation

agreement in generalities—barring any conversation of the specific amounts offered.

The Railroad also attempted to offer testimony from Houck, Smith, and Lipka. But consistent with its pretrial order, the district court prevented Houck from testifying because the Railroad blocked Ingram from deposing her. The Railroad then asked for Smith to take the stand, arguing he could directly refute some of Ingram's testimony about the July 2018 washout. After Ingram objected, the Railroad conducted an offer of proof, but the court ultimately found that Ingram's testimony about the washout was not so surprising to justify Smith testifying when he was not previously disclosed as a witness. And, because Smith was not privy to the conversations between Lambi and Ingram, the district court did not see impeachment value that would outweigh the prejudice to Ingram.[4] But the district court did not foreclose the Railroad from offering Smith as a surrebuttal witness if appropriate. Finally, the Railroad sought to have Lipka take the stand to offer direct impeachment evidence. Again Ingram objected, noting that Lipka was not included on the Railroad's witness list. The district court did not allow the testimony, once again concluding that Ingram's testimony about Lipka was "very foreseeable." And the district court noted that, while impeachment evidence is not to be taken for the truth of the matter asserted, the court

> [did] not believe there would be a curative instruction . . . powerful enough to make it clear to the jury that they're not supposed to take anything that he says for its truth. He's the guy that wrote the plan. The jury's gonna take that evidence and they're gonna use . . . it for its truth.

---

[4] Lambi testified and refuted Ingram's telling of events.

Ultimately finding the probative value outweighed by the prejudice to Ingram, the district court prevented Ingram from testifying in the Railroad's case-in-chief, but provided that the Railroad could offer Lipka in surrebuttal if appropriate.

At the close of evidence, the Railroad renewed its motion for directed verdict, arguing again that the damages Ingram asked for were only an estimate and also arguing, for the first time, that the court should have used the "objective reasonableness test." The motion was again denied.

The jury found that the Railroad had breached its contract with Ingram and violated the IWPCL. It found Ingram was entitled to $165,385 in unpaid wages. The jury also specifically found the Railroad intentionally failed to pay the due wage, thereby granting Ingram $165,385 in liquidated damages, and bringing the total verdict to $330,770. Ingram was also awarded attorney fees and expenses.

In response, the Railroad filed a combined post-trial motion for a new trial and JNOV. In the motion's introduction and conclusion, the Railroad asserted the jury's finding was in violation of law on both the IWPCL and breach claims. But the body of its argument addressed only the IWPCL claim; yet the Railroad addressed both claims in its reply brief. The district court noted that, because a reply brief can only raise "newly decided authority" or "respond to new and unanticipated matters," the breach claim was not at issue in the motions, but still analyzed both claims in its order.

As to the motion for new trial, the Railroad pointed to the evidentiary concerns about the separation agreement and testimony from Smith, Lipka, and Houck. The district court denied the Railroad's motion in its entirety.

Ingram submitted his request for attorney fees, which the Railroad resisted; but before the district court decided the issue, the Railroad appealed. It subsequently appealed a second time after attorney fees were awarded in their entirety—$227,259.71. Our supreme court consolidated the two actions into this appeal.

## II. Analysis.

The Railroad argues (1) the district court erred by submitting the IWPCL claim to the jury and by denying the Railroad's motion for a new trial because the district court excluded admissible evidence and (2) the court should have used the objective reasonableness test in its weighing of evidentiary value and included it in jury instructions. Further, the Railroad argues the district court abused its discretion in awarding Ingram's attorney fees. We handle each challenge in turn.

A. The IWPCL Claim.

The IWPCL, or Iowa Code chapter 91A, sets out a framework requiring an "employer [to] pay all wages due its employees." Iowa Code § 91A.3(1) (2019). Iowa Code section 91A.8 states:

> When it has been shown that an employer has intentionally failed to pay an employee wages or reimburse expenses pursuant to section 91A.3, whether as the result of a wage dispute or otherwise, the employer shall be liable to the employee for any wages or expenses that are so intentionally failed to be paid or reimbursed, plus liquidated damages, court costs and any attorney's fees incurred in recovering the unpaid wages and determined to have been usual and necessary.

With that framework in mind, the Railroad argues Ingram's IWPCL claim should never have gone to the jury because Ingram (1) did not prove he was owed a wage and (2) even if the retention account was a wage, it was not due. The Railroad

also argues the district court should have granted its motion for a new trial because of evidentiary issues.

Ingram, for his part, argues a number of the Railroad's claims have not been preserved for appeal, so we begin by determining what was properly preserved for our review.

*i. Error Preservation.*

"It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal." *Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002). Error-preservation rules are not meant to be hypertechnical, but they do "require that the nature of any alleged error be timely brought to the attention of the district court." *Mitchell v. Cedar Rapids Cmty. Sch. Dist.*, 832 N.W.2d 689, 695 (Iowa 2013).

In its brief, the Railroad argues the district court erred by denying its motion for summary judgment on the IWPCL claim. Not only is "[t]he denial of a motion for summary judgment . . . no longer appealable once the matter proceeds to a trial on the merits," *Lindsay v. Cottingham & Butler Ins. Servs., Inc.*, 763 N.W.2d 568, 572 (Iowa 2009), but it also does not preserve error. *See Figley v. W.S. Indus.*, 801 N.W.2d 602, 608 (Iowa Ct. App. 2011); *Neuroth v. Preferred Cartage Serv., Inc.*, No. 05-0320, 2006 WL 2871997, at *3 (Iowa Ct. App. Oct. 11, 2006) ("Arguments denied in a motion for summary judgment, however, are not preserved after a full trial on the merits, unless the issue is somehow preserved

through action at trial."). Our review is limited, then, to the arguments the Railroad advanced in specific objections and motions at trial.[5]

In this case, the Railroad made two motions for directed verdict. In both, it asserted Ingram's claims must fail because he could not produce more than an estimate of what his damages were. In its second motion, at the close of its evidence, it also urged the court to apply the test of objective reasonableness.

In its appellate brief, however, the Railroad argues the IWPCL claim should not have been submitted to the jury because, as a matter of law, Ingram failed to prove the retention payment was a wage or that such a wage was due—as necessary to succeed on a claim under the IWPCL. Aside from arguments about the certainty of the wage, though, these arguments were not raised in the Railroad's motions for directed verdict. And while the argument was addressed in the Railroad's JNOV motion, this alone cannot preserve error for our review. *See Royal Indem. Co. v. Factory Mut. Ins. Co.*, 786 N.W.2d 839, 845 (Iowa 2010) ("A motion for [JNOV] must stand on grounds raised in the directed verdict motion."). Still, the Railroad has preserved its arguments about the exactitude of the damages, so we address that concern and review the district court's denial of the JNOV motion for correction of errors at law. *See id.* at 846.

---

[5] We note that no objections were made to the jury instruction outlining the elements of the IWCPL claim, making that instruction the "law of the case." *See In re Estate of Workman*, 903 N.W.2d 170, 175 (Iowa 2017).

*ii. Certainty of Damages.*

The jury was instructed Ingram had to prove "[t]he amounts owed under the [k]ey [m]anager [r]etention [p]lan constitute[d] 'wages,'" which were defined under the plan as:

> Any payments to the employee or to a fund for the benefit of the employee, including but not limited to payments for medical, health, hospital, welfare, pension, or profit-sharing, which are due an employee under an agreement with the employer or under a policy of the employer. The assets of an employee in a fund for the benefit of the employee, whether such assets were originally paid into the fund by an employer or employee, are not wages.

The Railroad argues Ingram could not succeed on the merits of his IWPCL claim because he failed to establish the exact amount of damages owed. As evidence supporting his requested damages, Ingram submitted his 2017 accrual total. The Railroad admitted, in answers to interrogatories, that its retention factor for 2018 was calculated at 1.10. Ingram used this information and his past bonus awards to reach his total requested damages. But the Railroad maintains his numbers were only estimates because the retention factor did not reflect what the company's financials would have looked like had he remained employed for the whole of 2018.[6]

Under Iowa law, however, damages "need not be proven to a mathematical certainty." *PRO Com. LLC v. Mallory Fire Prot. Servs., Inc.*, No. 15-1420, 2016 WL 7395728, at *3 (Iowa Ct. App. Dec. 21, 2016). This is because "[t]here is a recognized distinction between proof of the fact that damages have been sustained

---

[6] At trial, Ingram agreed on cross-examination that "the fact that the company would no longer have had [his] salary on the payroll, could have been expenses associated with [his] work as well; that would change the financial information that the company had for 2018."

and proof of the amount of those damages." *Natkin & Co. v. R.F. Ball Constr. Co.*, 123 N.W.2d 415, 422 (Iowa 1963). It is true that "[o]ne cannot recover if it is speculative and uncertain as to whether the damages claimed have actually been sustained, but if the uncertainty lies only in the amount of damages, recovery may be had if there is proof of reasonable basis from which the amount may be inferred." *Id.* And while it is true the retention factor calculation did not account for Ingram's salary after November 16, 2018, Ingram provided a reasonable basis for the jury "to make an approximate estimate of the loss." *See Data Documents, Inc. v. Pottawattamie Cnty.*, 604 N.W.2d 611, 617 (Iowa 2000); *Natkin & Co.*, 123 N.W.2d at 423 ("[A] defendant who has voluntarily breached a contract cannot demand proof of plaintiff's damages therefrom with great particularity or exactness." (citation omitted)). Even in cases where our supreme court has considered the calculation of wages specifically, it has allowed an approximation rather than precision. *See Runyon v. Kubota Tractor Corp.*, 653 N.W.2d 582, 586 (Iowa 2002) (acknowledging a bonus cannot be due "until it can be accurately estimated in accordance with the parties' agreement"). We, like the district court, find no merit in the Railroad's complaint about the certainty of the amount of Ingram's requested damages; therefore, the matter was correctly submitted to the jury.

*iii. Motion for New Trial: IWPCL.*

The Railroad also argues the district court should have granted its motion for a new trial after making evidentiary missteps. Specifically, the Railroad asserts that the separation agreement withheld from the jury would have shown it did not intentionally fail to pay Ingram the wage, which would change his entitlement to

liquidated damages under the IWPCL. Even relevant evidence may be excluded by the court "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Iowa R. Evid. 5.403. "We review the denial of a motion for new trial based on the grounds asserted in the motion." *Fry v. Blauvelt*, 818 N.W.2d 123, 128 (Iowa 2012). And "[w]e generally review challenges to district court decisions to exclude or admit evidence for an abuse of discretion." *Hawkins v. Grinnell Reg'l Med. Ctr.*, 929 N.W.2d 261, 265 (Iowa 2019). A court abuses its discretion when "such discretion was exercised on grounds or for reasons clearly untenable or to an extent clearly unreasonable." *Bremicker v. MCI Telecomm. Corp.*, 420 N.W.2d 427, 428 (Iowa 1988).

At trial, the Railroad attempted to admit the separation agreement into evidence; Ingram objected under Iowa Rule of Evidence 5.408. Rule 5.408(a) prohibits the use of evidence, by any party, of (1) "Furnishing, promising, or offering—or accepting, promising to accept, or offering to accept—a valuable consideration in compromising or attempting to compromise the claim that was disputed on either validity or amount," or (2) "Conduct or a statement made during compromise negotiations about the claim" "to prove the validity or amount of a disputed claim." But it can be admitted for purposes other than proving validity or amount of a disputed claim "such as proving a witness's bias or prejudice, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution." Iowa R. Evid. 5.408(b). And, "[t]he offer of settlement or compromise exclusionary rule is designed to exclude this evidence only when it is

tendered as an admission of weakness of the other party's claim or defense, not when it is tendered to prove a fact other than liability." *Pogge v. Fullerton Lumber Co.*, 277 N.W.2d 916, 921 (Iowa 1979). "It is generally held that offers to compromise disputed claims are inadmissible because they are irrelevant and because policy considerations[7] require their exclusion." *Lewis v. Kennison*, 278 N.W.2d 12, 14 (Iowa 1979). And, "such evidence has low probative value because the motivation to settle may be 'a desire for peace rather than . . . any concession of weakness of position." *State v. Thoren*, 970 N.W.2d 611, 638–40 (Iowa 2022) (Waterman, J., concurring specially) (alteration in original) (citation omitted).

In their appellate brief, the Railroad argues again that the separation agreement was offered to show it did not intentionally withhold wages from Ingram and that the Railroad had no animus towards Ingram. We agree that this fits under the exception to 5.408 because the separation agreement was not being offered by the Railroad to show "an admission of weakness of [Ingram's] claim or defense." *Id.* Rather, it was offered to show the Railroad did not believe the payment was due, which is an independent justification our supreme court has approved of in the past for allowing this kind of evidence. *See Miller v. Component Homes, Inc.*, 356 N.W.2d 213, 216 (Iowa 1984) ("Furthermore, these letters had probative value quite aside from any consideration of admissions. In attempting to prove a violation of chapter 91A, Miller was required to show his employer's failure to pay was intentional. The letters demanding the $13,000 in commissions tended to

---

[7] The commonly cited policy concern is that allowing this kind of evidence would put a "chill on settlement or settlement attempts." *See Graber v. City of Ankeny*, 616 N.W.2d 633, 639–40 (Iowa 2000).

show that Component Homes had not inadvertently failed to pay him." (internal citation omitted)).  We tend to agree with the Railroad that this offering did not run afoul of the purpose underlying rule 5.408.  But we recognize the prejudice to Ingram because the separation agreement was signed by him and then withdrawn.

Regardless, to prove a new trial is necessary due to wrongly admitted or excluded evidence, the moving party must show they were prejudiced by the decision.  *Hawkins*, 929 N.W.2d at 266; *see also* Iowa R. Evid. 5.103 ("A party may claim error in a ruling to admit or exclude evidence only if the error affects a substantial right of the party . . . .").  And in this case, the district court ruled that "if the [Railroad] wishes to explain why generally an offer would have been made, you'll be free to do that and talk about the process that that went about, but I think bringing in the actual document just goes too far."  The Railroad asserts it should have been allowed to use the agreement to rebut Ingram's testimony that he did not know why he was not paid under the plan.  But Allen, who was in the meeting when Ingram was terminated, testified about how Ingram asked after his termination why he was not being paid his retention benefits; she responded that she did not believe the amounts were due.  And while the Railroad argues that the fact it was willing to offer an agreement to Ingram shows a lack of animus,[8] the district court allowed testimony about the existence of the document—it simply excluded the document itself.  So, exclusion of the document itself did not constitute more than harmless error.  *See Kengorco, Inc. v. Jorgenson*, 176

---

[8] Allen also testified at trial that the Railroad offered the separation agreement and portion of the retention bonus "to recognize [Ingram] for, you know, the part of the time that he had given the company . . . in regards to . . . his work."

N.W.2d 186, 189 (Iowa 1970) ("In any event, as we have indicated, any error in the exclusion of evidence is harmless error where the same evidence is subsequently admitted and considered by the finder of fact or the court."); *Hamilton v. O'Donnell*, 367 N.W.2d 293, 295 (Iowa Ct. App. 1985) (noting that, where other testimony was offered that filled in the gaps of the excluded evidence, "the exclusion [of evidence] constitute[s] harmless error").

B. The Breach-of-Contract Claim.

We turn next to the Railroad's concerns under Ingram's breach of contract claim.

*i. Summary Judgment.*

Next, the Railroad argues that, as a matter of law, the breach claim should not have been submitted to the jury. Again, the Railroad argues the district court should have granted its motion for summary judgment; however, this is no longer appealable at this stage in the proceedings and that motion does not preserve error. *See Lindsay*, 763 N.W.2d at 572; *see also Figley*, 801 N.W.2d at 608. As such, we do not address this challenge further.

*ii. Motion for New Trial: Breach of Contract.*

Next, the Railroad argues the district court incorrectly denied its motion for a new trial because the court failed to use the objective reasonableness test. Specifically, it argues the district court should have instructed the jury on the standard and should have used it to tailor its evidentiary rulings. "We review the denial of a motion for new trial based on the grounds asserted in the motion." *Fry*, 818 N.W.2d at 128. "[W]e review refusals to give a requested jury instruction for

correction of errors at law." *Alcala v. Marriott Int'l, Inc.*, 880 N.W.2d 699, 707 (Iowa 2016).

The objective reasonableness standard gives "employers great deference in making 'cause' termination decisions." *Kern v. Palmer Coll. of Chiropractic*, 757 N.W.2d 651, 659 (Iowa 2008). Under this framework,

> the judicial fact-finder's role is not to determine whether the facts underlying the employer's "cause" determination were actually true, or to conduct de novo review of whether the facts found by the employer amounted to "cause" for termination under the terms of the contract. Instead, the judicial fact-finder determines only whether the cause claimed by the employer for termination was "a fair and honest cause or reason, regulated by good faith on the part of the party exercising the power," based on facts "supported by substantial evidence and reasonably believed by the employer to be true," and "not for any arbitrary, capricious, or illegal reason."

*Id.* (citation omitted).

To begin, it is important to note this standard has not been adopted in Iowa; in *Kern*, our supreme court explicitly rejected the objective reasonableness standard in cases where "for cause" is defined by the contract at issue and "[left] for another day the decision of whether the [objective reasonableness] rule granting greater deference to the employer's determination of 'good cause' should apply where the employment contract fails to define the standard to be applied by the fact-finder." *Id.* at 660, 660 n.6. The Railroad argues that this case presents the opportunity for the test's adoption. But in Iowa, "the task of interpreting the contractual terms that give rise to the event claimed to justify the termination [of an] employment contract" has been left to the jury. *See Hunter v. Bd. of Trs. of Broadlawns Med. Ctr.*, 481 N.w.2d 510, 516 (Iowa 1992); *see also Kern*, 757 N.W.2d at 669 (Appel, J., concurring specially) (noting "a jury [is] always entitled

to determine the true reason for a discharge"). Importantly, our court is "not at liberty to overturn Iowa Supreme Court precedent." *State v. Hastings*, 466 N.W.2d 697, 700 (Iowa Ct. App. 1990).

*a. Jury Instruction.*

We look first to the Railroad's contention that the jury should have been instructed to follow the objective reasonableness standard. While it is right that "Iowa law requires a court to give a requested jury instruction if it correctly states the applicable law and is not embodied in other instructions," *Alcala*, 880 N.W.2d at 707, the objective reasonableness standard does not fit this mold. Because it has not been adopted as Iowa law, the district court did not err by not instructing the jury under this standard.

*b. Excluded Witnesses: Smith and Lipka.*

We turn next to two witnesses the Railroad argues should have been allowed to testify: Smith and Lipka.[9] As to any argument the Railroad has that the district court should have considered the objective reasonableness test when determining the evidence's probative value, we echo our earlier statement that this is not consistent with Iowa law. Insofar as it is arguing the evidence should have been admitted regardless, "[w]e generally review challenges to district court decisions to exclude or admit evidence for an abuse of discretion," *Hawkins*, 929 N.W.2d at 265, which requires a showing that "such discretion was exercised on

---

[9] The Railroad also mentions, in a footnote in its brief, that the district court erred in not allowing Houck to testify. The Railroad provides no legal authority that the district court was required to allow Houck to testify in contravention of its own order dictating she could not testify unless Ingram was allowed to depose her. *See* Iowa R. App. P. 6.903(2)(g)(3) ("Failure to cite authority in support of an issue may be deemed waiver of that issue.").

grounds or for reasons clearly untenable or to an extent clearly unreasonable." *Bremicker*, 420 N.W.2d at 428.

Under Iowa Rule of Civil Procedure 1.500, parties are required to provide one another "[t]he name . . . of each individual likely to have discoverable information, along with the subjects of that information, that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment." Impeachment evidence is that "used to undermine a witness's credibility." *Impeachment Evidence*, *Black's Law Dictionary* (9th ed. 2009). This requirement, that parties must disclose witnesses unless they are solely for impeachment, was echoed in the district court's trial scheduling and discovery plan.

The testimony of Smith was offered by the Railroad in response to Ingram's assertions that he stopped the train from going over the bridge in the July 2018 washout against Lambi's wishes. To attack Ingram's credibility, the Railroad wished to call Smith to challenge the truth of Ingram's testimony that Lambi demanded the train proceed despite the bridge's condition. In an offer of proof, Smith relayed that Ingram never told him to "run the fucking train" even though he was the roadmaster in charge of the territory encapsulating the bridge and had authority to check the bridge during the washout. But Smith did not have personal knowledge of the actual conversation between Ingram and Lambi or the timing of the conversation. Likewise, the Railroad's assertion that it needed Smith's testimony to show that he stopped the trains and it was his authority that prevented them from running also did not contradict Ingram's discussion of the determinations that were made on the ground—that the state of the bridge

prohibited train travel. Because Smith's testimony does not impeach Ingram, the probative value of his testimony does not outweigh the prejudice faced by Ingram due to the Railroad's failure to disclose Smith as a witness. *See* Iowa R. Evid. 5.403; *Berry v. Maple Valley Cmty. Sch. Dist.*, No. 02-0168, 2003 WL 118508, at *1–2 (Iowa Ct. App. Jan. 15, 2003) (holding a district court did not abuse its discretion in excluding an unlisted witness's testimony that did not "clearly rebut a new matter offered in [the opposing party's] case"). Therefore, we find no abuse of discretion warranting the grant of a new trial.

The Railroad also wished to call Lipka to contradict Ingram's understanding of the contract terms. But here, we need to again address error preservation. As to this claimed error, Ingram contests whether the Railroad preserved error on this issue. Under Iowa law, "when the trial court refuse[s] to allow [testimony], [the offering party has] the burden to demonstrate the substance of her proposed testimony by an offer of proof." *Strong v. Rothamel*, 523 N.W.2d 597, 599 (Iowa Ct. App. 1994); *see also* Iowa R. Evid. 5.103(a)(2). The Railroad argues error is preserved because there is an exception to this rule when "the substance [of the offer of proof] was apparent from the context." Iowa R. Evid. 5.103(a)(2). On this record, however, we do not find that necessary level of clarity. *See Brooks v. Holtz*, 661 N.W.2d 526, 529 (Iowa 2003) ("'[A] meaningful record for appellate review' exists when the court does not have to speculate on the evidence sought to be introduced." (alteration in original) (citation omitted)). While it is clear that the Railroad wished to show Lipka's interpretation of the terms, we cannot know what his testimony would have consisted of without an offer of proof. Because error

was not preserved, the Railroad's argument surrounding Lipka's exclusion must fail.

C. Attorney Fees.

Finally, the Railroad argues that the court wrongly awarded Ingram the entirety of his requested attorney fees. "We review the district court's award of attorney fees for an abuse of discretion." *GreatAmerica Leasing Corp. v. Cool Comfort Air Conditioning and Refrigeration, Inc.*, 691 N.W.2d 730, 732 (Iowa 2005). "The district court is considered an expert in what constitutes a reasonable attorney fee, and we afford it wide discretion in making its decision." *Id.* at 733. "The discretionary decisions of the trial court are presumed to be correct until the contrary is shown by the complaining party." *Bremicker*, 420 N.W.2d 427, 428 (Iowa 1988). "Reversal is warranted only when the court rests its discretionary ruling on grounds that are clearly unreasonable or untenable." *Gabelmann v. NFO, Inc.*, 606 N.W.2d 339, 342 (Iowa 2000).

"When an employee prevails on a wage claim under [the IWPCL], the district court is required to assess attorney fees and costs against the employer." *Id.* This assessment is based on Iowa Code section 91A.8, which allows recovery of "court costs and any attorney's fees incurred in recovering the unpaid wages and determined to have been usual and necessary." Courts consider the following factors:

> the time necessarily spent, the nature and extent of the service, the amount involved, the difficulty of handling and importance of the issues, the responsibility assumed and results obtained, the standing and experience of the attorney in the profession, and the customary charges for similar services.

*Gabelmann*, 606 N.W.2d at 343 (citations omitted). "The purpose of the statute is to reimburse the employee for the expenses incurred in suing for back wages." *Id.* In determining an appropriate award of attorney fees, the district court is not required to "sort out precisely hour by hour what legal work was performed to support what allegation," *Vaughan v. Must, Inc.*, 542 N.W.2d 533, 541 (Iowa 1996), and "there is no 'rigid formula' that must be followed." *Smith v. Iowa State Univ. of Sci. & Tech.*, 885 N.W.2d 620, 627 (Iowa 2016).

The Railroad raised three concerns with the district court's award, challenging: (1) fees for the breach of contract claim, (2) fees for claims not successfully pursued, and (3) research, transcript, and copying costs. Ingram also asks for appellate attorney fees.

*i. Breach of Contract.*

As to the breach-of-contract claim, the Railroad points us to *Smith v. Iowa State University of Science and Technology*, which concerns a different statute that, like the IWPCL, allows for the recovery of attorney fees. *See* 885 N.W.2d at 624. In that case, our supreme court dealt with separating fees incurred for the claim allowing attorney fees and those which typically do not. *Id.* It explained "[t]he ultimate question is whether the work for which recovery is sought can be 'deemed to have been "expended in pursuit of"' a claim for which attorney fees are recoverable." *Id.* (citations omitted). While the claims in *Smith* were based in common facts, the claims were not interrelated. *Id.* This is distinct from Ingram's claims—in the case at hand, success on the breach claim was a necessary first step to proving a violation of the IWPCL. *See Lee v. State*, 874 N.W.2d 631, 649 (Iowa 2016) ("The court may properly award any fees incurred in the litigation

involving 'a common core of facts' or 'based on related legal theories.'" (citation omitted)). Because the work done to prove the breach claim was also necessary for the pursuit of the IWPCL claim, we find no abuse of discretion by the district court in not reducing the award for this purpose.

*ii. Alternative Claims and Discovery.*

The Railroad next argues the district court was wrong not to reduce the award based on time spent on claims ultimately not brought and discovery battles not won. It points specifically to Ingram's exploration of claims against third parties, for breach of fiduciary duty, ERISA violations, against Railroad employees, and for breach of good faith and fair dealing. It also protests the award of fees accrued in Ingram's unsuccessful attempt to depose Houck.

The district court here found that the various theories explored and discovery sought were necessary costs to pursue the IWPCL claim.[10] And our supreme court has found no abuse of discretion when, viewing the case as a whole, a district court granted attorney fees without weeding out "time expended on unsuccessful claims involving alternate and related claims," particularly when the "unsuccessful claims involve a common body of facts related to [the] successful claims." *Lynch v. City of Des Moines*, 646 N.W.2d 236, 239 (Iowa 1990); *see also*

---

[10] The court stated:

> The [c]ourt finds the time spent was necessary to pursue [Ingram's] [IWPCL] claim, the nature and extent of the services were reasonable, the amount involved was reasonable, the difficulty handling the issues in this matter, the results obtained for the Plaintiff, the standing and experience of the attorneys in the profession, and the fact these fees are customary charges in Linn County, Iowa leads to the conclusion these fees are ordinary, necessary, and reasonable in pursuing [Ingram's] claim under [the IWPCL].

*Smith,* 885 N.W.2d at 626 ("Rarely is litigation an unbroken string of successes. Just about every legal proceeding involves setbacks.").[11]  The Railroad has not pointed us to any authority that contradicts the district court's finding that these explorations were not usual or unnecessary for IWPCL litigation, especially in light of our finding that Ingram's contract claims were sufficiently interrelated to the IWPCL claim to allow for awarding attorney fees.  The Railroad, then, has not met its burden to show the district court abused its discretion.

   *iii. Research, Transcript, and Copying Costs.*

   Finally, the Railroad takes umbrage with the district court's award of costs for research, transcripts, and copying.  The district court found these costs were those "ordinarily included in attorney fees" and "typical for litigation, particularly litigation as contentious as this case, and are at a reasonable cost as well."

   As to research, the Railroad contends Ingram's presented evidence was not sufficient to prove the research "reasonably relate[d] to the issue at hand."[12]  *Lee v. State*, 906 N.W.2d 186, 195 (Iowa 2018).  We disagree.  Ingram provided an itemized break down of the time his attorneys spent on his case, including the research they conducted.  *See id.* at 196 ("While a party does not need to 'record in great detail how each minute of his time was expended,' he must provide at a minimum sufficient documentation to 'identify the general subject matter of his time

---

[11] While both parties send us to cases about unsuccessful claims, most of the claims the Railroad complains about were really unpursued claims.  Ingram was successful on both claims ultimately brought before the jury.

[12] The Railroad also makes passing reference that Ingram failed to show these were "costs normally billed to a paying client in the relevant market."  Because this was not developed into a cognizable legal argument, we do not address it.  *See* Iowa R. App. P. 6.903(2)(g)(3).

expenditures.'" (citation omitted)). The Railroad points us to *Lee*, where the attorneys simply labeled their time as "research" or something similarly vague—this is a far cry from the descriptions provided in this case.

In terms of the transcript costs, the Railroad objects specifically to the costs of procuring transcripts of Satunas's and Allen's depositions because they were not introduced into evidence. *See* Iowa R. Civ. P. 1.716. A reading of the record shows this is not accurate—pages of trial transcript from this case are taken up by Ingram reading portions of each of these depositions into evidence. Without more than factual inaccuracies to rest this claim on, we consider it no further.

Finally, as to copying costs, Iowa Code section 625.6 states, "The necessary fees paid by the successful party in procuring copies of deeds, bonds, wills, or other records filed as a part of the testimony shall be taxed in the bill of costs." The Railroad argues that Ingram did not adequately explain how the copying costs requested were incurred. We agree. Parties can be reimbursed for the costs of *procuring* copies, not their printing costs. *See Schewe v. Beck*, No. 22-0332, 2022 WL 5063833, at *5 (Iowa Ct. App. Oct. 5, 2022) ("As for the copy expense for photographic exhibits, we find that cost is not a fee paid to procure copies of 'deeds, bonds, wills, or other records.'" (citation omitted)). With no expenses for the procurement of these types of records clearly listed on their itemization of costs, we agree the award of this cost was an abuse of discretion and reverse the district court as to just this cost.

*iv. Appellate Attorney Fees.*

Ingram also requests the award of appellate attorney fees. Without a record to determine an appropriate award of fees, we remand the issue to the district court

for the limited purpose of determining the usual and necessary fees of this appeal. *See Runyon*, 653 N.W.2d at 588 ("Under Iowa Code section 91A.8, [plaintiff] is entitled to a further award of 'usual and necessary' attorney fees and costs expended in defending this appeal. We therefore remand to the district court for a hearing on that matter." (internal citations omitted)); *see also Olver v. Tandem HCM, Inc.*, No. 10-0225, 2010 WL 4885252, at *4 (Iowa Ct. App. Nov. 24, 2010) ("Under the statute, the award of attorney fees to a successful litigant is mandatory. This includes appellate attorney fees where appropriate." (internal citations omitted)).

**III. Conclusion.**

As we cannot review the district court's denial of summary judgment and we find no error or abuse of discretion in what has been properly preserved for our review of the denial of the Railroad's motion for JNOV and a new trial, we affirm the jury's verdict for Ingram. We find an abuse of discretion in the district court's award of copying costs as part of attorney fees, so we reverse the award as to the copying costs only but otherwise affirm the court's award of attorney fees. Further, because Ingram was largely successful in defending his claims on appeal, we remand to the district court to determine an appropriate award of appellate attorney fees. *See* Iowa Code § 91A.8.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**